THE STATE, DEFENDANT IN ERROR, v. PASQUALE DELISO, PLAINTIFF IN ERROR.

Argued December 11, 1907—Decided March 2, 1908.

1. Upon the trial of an indictment it was not error for the court to permit the state peremptorily to challenge a juror before he was directed to be sworn, although such juror, when so challenged, had placed his hand upon the book at the instance of the clerk, who thereupon commenced to recite the words of the oath.
2. *State* v. *Lyons*, 41 *Vroom* 655, followed.
3. The allowance of such a challenge works no legal injury to the defendant as long as neither his right to have a jury selected from the jurors legally summoned nor his right to reject such jurors peremptorily is impaired. The essence of the latter right is that it shall afford a person the privilege of saying that some particular jurors shall not try him, not the privilege of saying what particular jurors shall try him.
4. When, upon the trial of an indictment, testimony is adduced by the state that is admissible as to some aspects of the case, but is inadmissible to show the bad character of the defendant or his commission of other crimes, an objection to the admission of such testimony or a motion to strike it out is addressed to the sound discretion of the trial court.

5. Several offences, forming parts of a series of acts evincing a continuous state of mind in the defendant and culminating in the criminal act for which he is indicted, are admissible in evidence upon the trial of such indictment.
6. Upon the trial of an indictment for murder the defendant was convicted of murder in the first degree by a jury who had been instructed that "the testimony is uncontradicted that there was a threat to kill; that Luigi (the murdered man) was dragged from under the cot and pleaded for mercy and kissed the hand of his assailant and was shot. If you believe that, the guilty person was guilty of murder in the first degree." *Held*, that, assuming that the enumerated circumstances conclusively show a willful murder, the instruction was erroneous in that it did not inform the jury that into such willfulness the statutory elements of "deliberation" and "premeditation" must also have entered.

On error to the Middlesex Oyer and Terminer.

For the plaintiff in error, *Alan H. Strong.*

For the state, *George Berdine,* prosecutor of the pleas.

The opinion of the court was delivered by

GARRISON, J. The plaintiff in error having been convicted of murder in the first degree and sentenced to death in the Court of Oyer and Terminer of Middlesex county brings this writ of error to reverse the said judgment.

Observing the order adopted in the brief of counsel the first ground for reversal to be considered is that: "The court erred in permitting the state to challenge a juror peremptorily after the administration of the oath had been begun."

The incident of the trial to which this contention is deemed applicable was as follows: A juror of the general panel having been called and a challenge to the favor made by the state the juror was sworn on *voir dire* and examined by the prosecutor and by counsel for the prisoner. When counsel had finished their examinations the succeeding occurrences as narrated in the bill of exceptions were as follows:

"Mr. Strong—Does the court sustain the challenge?

"The Court—No; I overrule the state's challenge.

"The Clerk—Does the defence challenge?

"Mr. Strong—No.

"(The clerk began to administer the oath to the juror.)

"Mr. Berdine—The state peremptorily challenges.

"Mr. Strong—I submit it is too late. After the oath has been started and after the state has challenged to the favor and has not challenged further and the defence has been called upon to challenge, it is too late, it seems to me.

"The Court—I think the state ought to interpose a peremptory challenge before the administration of the oath has begun, for the purpose of securing orderly procedure. In this case, however, the clerk had barely started to administer the oath when the challenge was interposed. I will sustain the state's challenge."

The contention on behalf of the plaintiff in error is that the trial court in sustaining this challenge exceeded its lawful authority to the prejudice of the prisoner. The legal proposition upon which this contention rests is "that a peremptory challenge interposed after the clerk had commenced to administer the oath comes too late," in support of which proposition *Leary* v. *North Jersey Street Railway Co., 40 Vroom* 67, and *State* v. *Lyons, 41 Id.* 635, are cited. The first of these cases was a Supreme Court decision in a civil cause and involved the consideration of a statute that on its face applied to civil causes alone, and also the construction of a statute that on its face was applicable solely to challenges for cause. Obviously the question of the right of peremptory challenge in a criminal case was neither in fact nor on principle before the Supreme Court or involved in its decision. The later case of State v. Lyons was a criminal case in this court upon the question of peremptory challenge, and would therefore be directly in point if the plaintiff in error in the present case were complaining, as the plaintiff in error in that case was, of the denial of his right of peremptory challenge, *i. e.,* the curtailing of his right to reject a juror. The argument presented to us, in so far as it seeks support from State v. Lyons, loses sight of the fundamental principle that the right of challenge is a right to reject and not a right to select.

*Thomp. Tr.* 43; *United States* v. *Marchant & Colson,* 12 *Wheat.* 480.

The essence of the right of challenge is that it shall afford an opportunity to every person to say that some particular jurors shall not try him, but it is no part of this or of any other system of trial known to our law (unless it be that of arbitration) that a person shall say by what particular jurors he or his cause shall be tried. A right that is in this sense unknown to the law is non-existent as a legal right, and the denial of a right that is legally non-existent cannot inflict a legal injury. In the recent case of State v. Moore in this court this doctrine was applied to the allowance of a peremptory challenge to a juror by one of two defendants jointly indicted against the protest of the other. The decision was that even if the challenge was not one that the trial court was bound to allow, the non-challenging defendant was not, in a legal sense, injured thereby, the effect being merely to reduce the number of the general panel from which the trial panel was selected. In his opinion Mr. Justice Reed adverts to the circumstance that it did not appear in the record that the protesting defendant had exhausted his challenges, or that the selection of a jury from the general panel was impaired. The same may be said in the present case, although in view of the statutory provision for summoning talesmen the latter circumstance may be without significance. The matter decided was that the allowance of a peremptory challenge was not a ground for reversal upon error so long as neither the right of the plaintiff in error to have a trial jury selected from the jurors legally summoned nor his right to reject such jurors was impaired.

It should furthermore be pointed out that the case of State v. Lyons is not only not an authority for the position taken by the counsel who cites it, but that, on the contrary, it is a distinct authority against such position and in favor of the judicial action of which complaint is made. State v. Lyons, as has been said, directly involved the right of the prisoner to reject by peremptory challenge a given juror. The precise question presented was, When did such right

end ? Or rather whether it was at an end when the clerk, in obedience to the direction of the court, had commenced to administer the prescribed oath to the juror. The proceedings at the trial, as certified upon that writ of error, recited that one Lappan, a juror, being called, came to the bar of the court, and after the prisoner had been formally interrogated by the clerk, "Do you challenge ?" the juror remained standing until a proper and reasonable time had elapsed for a challenge to be made, after which, no challenge having been made, the court directed the clerk to swear the said Lappan as a juror. Thereupon the said Lappan placed his hand upon the book and the clerk proceeded to administer to him the juror's oath, and after the clerk had commenced to recite the words of the oath, and before he had completed it, counsel for the prisoner communicated to the court a desire to challenge the juror peremptorily, which the court refused to entertain, upon the ground that the proper time for the prisoner to challenge the juror had gone by. In sustaining the propriety of this judicial action, Chancellor Magie, who delivered the opinion of this court, said : "The ancient practice is stated to be that, upon the return of the panel and the calling of the jury, the prisoner in a capital case is informed by the clerk that these good men now called and appearing are to pass upon his life and death; therefore, if he will challenge any of them, he is to do it before they are sworn. * * * By our provisions for a general panel of jurors, out of which a particular jury is selected by being drawn from the box, a modification of this practice had been introduced, and each juror whose name is drawn from the box is commanded to look upon the prisoner, and the latter is asked if he challenges. If no challenge is interposed within a reasonable time, the court directs the juror to be sworn. Upon such direction, or upon the oath being commenced in obedience thereto, the privilege of peremptory challenge ceases."

This quotation from the opinion in State v. Lyons makes it perfectly clear that what was decided in that case was that when the court directed the juror to be sworn, the right of challenging was at an end. The decision therefore places the

decorum of the trial and the orderly procedure essential to the rights of the parties wholly in the hands of the court, a result that it is obvious could not be otherwise attained. Whether time for consultation as to the making of challenges is to be allowed, and whether the proper and reasonable time for making a challenge has elapsed, are questions to be determined by the trial court. Having determined them, the court in fact or in theory directs the clerk to administer the oath. The commencement of the administration of the oath is therefore normally a judicial announcement that the time for challenging a juror has been allowed, and is at an end. The entire spirit of the rule thus laid down and its essential feature is the judicial participation in the procedure. If we turn now to the proceedings at the trial under review, as excerpted in an earlier part of this opinion, it will be seen at once that this essential feature, viz., the judicial direction to the clerk to administer the oath, was conspicuously absent. On the contrary, the certificate shows that the judge had been and was occupied with the trial and decision of a challenge for cause, and had but barely disposed of it when the clerk asked the prisoner if he challenged, and began to administer the oath to the juror, whereupon the prosecutor announced that he challenged. That this action of the clerk was expressly directed by the court is not pretended; that the trial judge had allowed what he considered a reasonable time for challenge cannot be assumed, for apparently his attention had not been directed to the matter; that the court either ratified or acquiesced in the unauthorized expedition of its ministerial officer is directly negatived by the court's own and immediate action in the premises. Confronted with this state of affairs, the case of State *v.* Lyons was a direct authority for the action of the trial judge in refusing to deny to the state the right of peremptory challenge merely because the clerk, without either the express or the implied direction of the court, had seen fit to hold out the book and to commence repeating the words of the oath to the juror.

Whether the discretionary action of the trial court is in any event concluded by the commencement of the adminis-

tration of the oath is a matter not involved in the facts of the present case, and hence one that has not been considered. Neither must it be inferred that it lies in the mouth of a belated challenger to set up the claim that the act of the clerk was not that of the court, unless it expressly so appeared. The act of the clerk is the act of the court whenever it is in conformity with the will of the court, whether such conformity be the result of express direction or of subsequent acquiescence or ratification. What we decide is that the action of the clerk, when not in conformity to the will of the court, is no bar to the exercise by the court of its established faculty of presiding over the orderly procedure at the trial. To substitute for this trained oversight the spontaneous activity of whatever court official happened to be in ministerial attendance upon the trial would result in anything but orderly procedure, even when it did not eventuate in rank injustice.

Our conclusion is that in the respect indicated there was no error in the empaneling of the trial jury by whom the plaintiff in error was convicted.

The next assignment of error to be considered is that "The court permitted one Cansarano to testify against the objection of the defendant that on the night of the shooting of Tenace certain persons broke in the door and entered the shanty in which the said Cansarano had then been sleeping, saying, 'Light the electric or we will kill you all,' and that the defendant was then near the door and thereupon entered the said shanty;" with which may be considered the next assignment, viz., that "the court having erroneously admitted the foregoing evidence did not strike out the same or clearly and explicitly instruct the jury to disregard said evidence, nor otherwise deal with the matter so as to remove from the mind of the jury the impression produced thereby."

To a proper appreciation of this branch of the case it is necessary to understand that Deliso, the defendant, together with Tenace (the man who was killed) and Cansarano, the witness under examination, were members of a large gang of laborers, mostly, if not wholly, Italians, employed at the Port Reading coal wharves, and occupying shanties each of which

consisted of a single room so arranged in rows that each row was covered by a single roof. The shanty occupied by Cansarano was some sixty or seventy steps from that occupied by the murdered man and in which he was slain. The testimony, to which the foregoing assignments refer, was to the effect that on the night Tenace was killed, and, inferentially, shortly before he was assaulted, the defendant, with others, had obtained entrance to the nearby shanty of Cansarano in very much the same manner and by the use of very much the same threats as those employed in obtaining admission to Tenace's shanty, and that, having so obtained entrance to Cansarano's shanty, the defendant and his comrades contented themselves with beating the inmates with sticks and then took their leave.

This testimony, which was objected to when offered, was admitted upon the undertaking of the prosecutor to supply evidence showing that the assault upon Cansarano and that upon Tenace had a common motive, viz., that each of the men were from a certain district in Italy toward the natives of which the defendant and his associates had enmity. The prosecutor was unable to supply the expected proof, the facts not being as he had understood them; thereupon the trial judge, in a colloquy with counsel over the propriety of striking out this testimony, said that certain parts of it must go out and that he thought he should have to say to the jury that all the testimony of Cansarano they were to regard was that which tended to show that the defendant was present at some time that evening in the neighborhood. When, however, the judge came to charge the jury, he gave them no instruction upon this head. Hence the counsel for plaintiff in error contends with much force that there had been no adequate or effective removal from the minds of the jury of the effect of the testimony which, in counsel's opinion, was illicit when offered.

It is not necessary, however, to pursue this question, for the reason that we have reached the conclusion that the testimony was admissible.

The assault upon Cansarano was, it is true, an offence for which, standing alone, the defendant might have been indicted, so that it was in that sense a separate offence, and it is also true that, regarded as a separate offence, it was inadmissible for the purpose of exhibiting the defendant's disposition in a bad light or of showing his predisposition to commit acts of violence. But it is also true of this testimony that it directly tended to prove the timely presence of the defendant at or near the scene of the crime with which he was charged, that it showed what he was doing there and his opportunities for its commission, and also the state of his mind and passions which, if carried forward and exhibited by him in the assault upon Tenace, was distinctly relevant. For the human passions that underlie the malice known to the law do not necessarily arise at the instant of crime; they have a natural history of their own—a birth, a growth and a maturity. Hence the distinction to be borne in mind between evidence that traces this natural phenomenon to its criminal debacle, and testimony as to isolated and entirely unconnected transactions, is that the latter merely tends to show the criminal character and predisposition of the accused, whereas the former has a direct relevancy to his state of mind when the given offence was committed. It is therefore the general rule that evidence of the former class is irrelevant, while proof of the latter sort is held to be admissible. The different treatment accorded to these two sorts of testimony does not wholly rest upon, and cannot, perhaps, be entirely justified by strict logic. Like so many other so-called rules of evidence, the rejection of one of these lines of proof and the acceptance of the other is due, in part at least, to the exigencies of the mode of trial and to the recognized necessity of placing some limit to the subjects of inquiry into which the jury shall be required to go. Be this as it may, one cogent reason for the rejection of testimony as to unconnected crimes is the impracticability of trying a defendant for such unconnected crimes with a view to reading his guilt thereof if established into the specified crime with which the jury is directly

concerned. In regard, however, to the other class of testimony, no such impediment exists; the question there is not the establishment of the defendant's guilt in respect to such isolated transaction, but the state of mind therein evinced by him, if it is shown to have been carried forward and exhibited in a criminal act so nearly related in time, place and circumstance that the mental state involved is practically continuous. Assaults by one "running amuck" (to use the descriptive orientalism) and multiple offences committed in the act of "shooting up a town" (to use the recent Americanism), are extreme but apt illustrations.

No practical difficulty arises so long as the two sorts of testimony do not overlap in the sense that testimony admissible under the one rule and for one object is inadmissible for the other purpose. When, however, such a situation is presented, what is called for is not a hard and fast rule upon the subject, but the exercise of sound judgment. So that when, as in the present case, a transaction offered in evidence is a distinct offence from one point of view, and at the same time is, from another point of view, the climax of a series of acts that culminated in the crime for which the defendant is on trial, the question of the rejection of the testimony *in toto,* or of its absolute or qualified admission, is for the trial judge to determine, subject to review in case of legal injury of the defendant. In the present instance we see no such injury, and hence find no ground for reversal either in the original admission of the testimony of Cansarano or in the refusal of the court to strike it out, if in fact there was such a refusal. If, instead of moving to strike out the testimony, the court had, upon request, refused to charge the jury as to the aspects of the case with respect to which the proof was relevant, a different question would be presented.

The complaint of counsel that he was debarred from addressing the jury upon testimony that he himself had asked to have stricken out shows, at most, a predicament of his own making. The assignment under consideration directs our attention to no reversible error.

There follow in the brief of counsel several subjects of minor criticism touching incidental rulings at the trial that need not now be considered.

The remaining matters discussed in the brief, with a single exception, to be hereafter considered, relate to the execution of the judgment before us, rather than to the judgment itself. With respect to the matters thus mooted, it is sufficient to say that they either come within the rule laid down in *State* v. *Bindernagle,* 32 *Vroom* 259, or else are specifically dealt with in the opinion delivered in this court by Mr. Justice Pitney in the recent case of State *v.* Tomassi.

The exception referred to is the assignment that ascribes error to an instruction contained in the charge touching murder in the first degree. The elements of that grade of murder had been stated generally in an earlier part of the charge, and later in his charge the trial judge, returning to the subject and making a specific application of his more general statement, said: "Nor are you likely to have much trouble in deciding whether there was premeditation and deliberation. The attack was made at or after midnight, when, so far as appears, all the Tenaces were in bed, and it was made apparently without provocation." Then follows the instruction upon which error is assigned: "The testimony of the boy Domeinio and the brother Joseph is uncontradicted that there was a threat to kill; that Luigi (the murdered man) was dragged from under the cot and pleaded for mercy and kissed the hand of his assailant and was shot. If you believe that, the guilty person was guilty of murder in the first degree."

This instruction is categorical. It selects from the mass of the testimony five concrete circumstances with respect to which the jury is in effect told that if they believe that the defendant killed Tenace under the circumstances thus detailed he was guilty of murder in the first degree. The importance of this instruction can hardly be overestimated. It was literally upon the vital point of the case. In considering the legal effect of this instruction it may, I think, be assumed that the enumerated circumstances demonstrate so conclusively the existence of a specific intent to take life that the

jury finding such facts to be established as to the defendant ought to have found that a specific intent to take the life of Luigi was also established. So that if the establishment of a specific intent to take life was conclusive that the homicidal act done in furtherance of such intent was a deliberate and premeditated killing, the instruction that if the jury believed the recited facts the person guilty of the killing was guilty of murder in the first degree would be inexpugnable upon error. It is, however, precisely the non-equivalence of these mental states in the perpetrator of a murder that is pointed out in the opinion delivered in this court in the case of *State* v. *Bonofiglio,* 38 *Vroom* 239.

In his opinion in that case Chief Justice Gummere, commenting upon the fact that this court, in *State* v. *Donnelly,* 2 *Dutcher* 601, had not accepted in its entirety the definition of murder in the first degree given by Chief Justice Green in the Supreme Court (*State* v. *Donnelly, Id.* 463), said, as to the part of the definition so rejected: "It is to be observed that the further declaration that 'wherever there is in committing a homicide a specific intention to take life, there is a willful, deliberate and premeditated killing, and the offence is murder in the first degree,' was not included in what was accepted by this court as an accurate statement of the law, and, presumably, this omission occurred advisedly, for the construction thus put upon the words 'deliberate' and 'premeditated' nullifies each of them, and makes every homicide murder in the first degree when the killing is willful. This is manifest, for the word 'willful,' although broader in its signification than 'intentional,' embraces the latter in its meaning."

If therefore, in the light of this discriminating criticism, it be conceded that the instruction under review completely satisfies the word "willful" in the statutory definition of murder in the first degree, it still fails to take into account or to give any effect to the equally important words "deliberate" and "premeditated." For it cannot have escaped observation that while the statute, in its enumeration of the three mental states essential to murder in the first degree,

places the word "willful" before "deliberate" and "premeditated," these mental states normally succeed each other in the inverse order, premeditation, both as a mental process and by force of its prefix, necessarily preceding that weighing of the mental content that is implied by the figurative term "deliberate," both of which must precede the adoption by the will of the matter thus previously meditated upon and weighed. So that even if the circumstances rehearsed in the instruction in the present case fully satisfied the word "willful" in the statutory description, it would still be fatally inadequate in that it in no way apprised the jury that into such willfulness the elements of premeditation and deliberation must have entered.

Concluding, as we do, that the instruction in question was erroneous, we have considered whether it could be viewed as a mere comment upon the testimony or be treated as an expression of opinion only upon a matter of fact. It was, however, neither of these. It was not in form or in substance a mere opinion; on the contrary, it was a categorical declaration that the enumerated facts were equivalent to murder in the first degree. Such judicial statement left no question to the jury saving their belief that such facts had been proved with respect to the defendant. Neither was it a mere comment upon the evidence, but, on the contrary, was a definite announcement of the effect to be given to a congeries of circumstances segregated from the rest of the testimony. So far from informing the jury that it was its duty to consider and weigh all other pertinent proof bearing upon the question of the degree of murder, the direct tendency of the instruction was to relieve the jury of any duty in that regard other than that of deciding whether the enumerated facts had been proved and whether the defendant was the guilty man. That there was other testimony bearing upon this important issue cannot be questioned. For instance, upon the question of the force to be given to the threats mentioned in the instruction, it was pertinent for the jury to recall and consider that similar threats to take the lives of the inmates of the Can-

sarano shanty had been made and had resulted not in any attempt to take life but merely in a beating with sticks. There was also testimony that the same assailants had once before on that same night, and shortly before the killing of Tenace, entered his shanty, making the same sort of threats, but retiring without evincing any murderous purpose. It was also of some significance that the first shot fired, although at short range, had, whether purposely or not, inflicted no injury on Tenace. The entire lack of any evidence of motive for the premeditated killing of Tenace was also a relevant, although, of course, not a controlling consideration. Indeed, much of the testimony introduced by the state as effective evidence against the plaintiff in error on the question of murder was pertinent, and, perhaps, favorable to the defendant upon the question whether he had compassed the killing of Tenace with deliberation and premeditation. It is not, of course, for us to say what verdict the jury would have reached upon a consideration of all the pertinent testimony; it is enough to say that a verdict rendered under the instruction complained of need not have taken all of the pertinent testimony into consideration.

By the foregoing considerations we are constrained to the conclusion that this erroneous instruction was a legal injury to the plaintiff in error that can be set right only by a new trial.

To this end the judgment of the Middlesex Oyer is reversed.

*For affirmance*—REED, GRAY, DILL, J.J. 3.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, TRENCHARD, BERGEN, BOGERT, VREDENBURGH, VROOM, GREEN, J.J. 9.