THE STATE, DEFENDANT IN ERROR, v. MARTIN EHLERS,
PLAINTIFF IN ERROR.

Argued September 21, 1922—Decided November 20, 1922.

1. Proof of "motive" is not essential to support a conviction of
   murder in the first degree.
2. If the killing is willful and the result of premeditation and
   deliberation it is murder in the first degree, no matter what
   defendant's motive may have been, nor although he in fact had
   no motive (used in the sense of self-serving reason) whatsoever.
3. A man (unless not sufficiently sane to know the quality and
   nature of the act, or that it was wrong) who kills his seven-
   year-old child to save it from anticipated future suffering and
   unhappiness is guilty of murder in the first degree if the killing
   be willful, premeditated and deliberate, although actuated only
   by motives of pure, even if mistaken, love and kindness.
4. Where the three essential elements of murder in the first degree,
   viz., willfulness, deliberation and premeditation are present,
   motive is unimportant, and it is only where there is an absence
   or uncertainty of direct proof of any one or more of these ele-
   ments that proof of motive becomes important, and then only,
   not because it is an element of the crime, but because it is often
   helpful in determining whether or not the crime was in fact
   committed.
5. Where there were three counts, viz., for murder, for man-
   slaughter, and for atrocious assault and battery, in the indict-
   ment, it was not error to refuse a motion to strike out the
   murder count at the end of the state's case on the ground that
   the state had not proved motive.
6. Where it is claimed that the defendant in a murder trial was
   not sufficiently sane or conscious at the time he committed the
   murder to know the quality and nature of his act or that it
   was wrong, this is a matter of defense and the burden of main-
   taining it is upon the defendant.
7. Where, in answer to clear, direct and uncontradicted proof of a
   willful, premeditated, deliberate killing, the defense of an epileptic
   seizure of the "petit mal" type at the time of the crime is set
   up and the other evidence thereof is of so unconvincing a char-
   acter as to have little if any weight, the mere absence of proof
   of motive will not suffice to justify a setting aside, as against
   the weight of the evidence of a jury's verdict of murder in the
   first degree.
8. Expert testimony that an adult defendant in a trial for murder
   is of a mental age of only twelve years, coupled with the further
   testimony by the same expert that twelve years was also the
   average mental age of our American soldiers in the world war,

and that the mental age theory "does not amount to shucks" so far as adults are concerned, commented on as tending to demonstrate that the mental age theory of the medical experts is, at least as applied to adults, based upon so arbitrary and unnatural a scale of years as a standard, as to be misleading to a layman, and useless, if not worse than useless, in the administration of justice by trial by jury.

9. It is not error to permit a witness to refresh his memory while testifying as to statements made by defendant shortly after the killing, by looking at the written memorandum thereof made by someone else in his presence, and then examined by him and found to be accurate.

10. In a trial for the murder of defendant's seven-year-old son, proof that immediately after the murder defendant went to the chief marshal of the town and said, "I have killed my child and my wife," is admissible, although all other evidence of the practically simultaneous killing of the wife had, by the apparently concerted effort of both the prosecution and the defense, been kept out of the case.

11. Such a statement made by the defendant upon his voluntarily surrendering himself to the chief of police immediately after the killing and while he presumably was acting as a result of the stress of the mental impulses accompanying the commission of the crime, rather than as a result of a subsequent and therefore probably a calculated self-serving conclusion, is admissible as part of the *res gestœ*.

12. Where another crime committed by the defendant is, in time and circumstance, so intimately connected with and a part of the crime for which he is being tried, as to show a state of mind indicating a purpose for its commission, such other crime may be proved to establish such state of mind.

---

On error to the Bergen County Court of Oyer and Terminer.

For the plaintiff in error, *Arthur M. Agnew* and *Joseph H. Gaugielle.*

For the defendant in error, *Archibald C. Hart,* prosecutor of the pleas, and *Charles J. McCarthy,* assistant prosecutor.

The opinion of the court was delivered by

WHITE, J. The verdict of the jury found the defendant, a laborer twenty-eight years old, guilty of murder in the first degree as charged in the indictment, and there was no

recommendation of life imprisonment. The indictment charged the murder of defendant's son, Walter, who was proved to be between six and seven years of age. There was another indictment against the defendant for murdering his wife, but there has been no trial as yet under this other indictment.

The defendant, who it appears did not stay employed very long at any place, and who had moved from Hoboken with his wife and three children into two attic bedrooms in a farm house near Woodridge in October, and then, losing his job in February, had left his family at Woodridge and gone to live with his "folks" in Hoboken while seeking work, and came to Woodridge on the afternoon or night in question to see his family, seems to have first shot his wife at about eleven o'clock at night from the landing at the head of the stairs, as she, in answer to his call, came up the stairs to the attic bedroom where he and their three children were. He then stepped back into the bedroom, "broke," that is, opened the breech of the single-barrel shotgun with which he had just shot his wife, ejected the exploded shell, took another loaded shell from the box of shells on the shelf, loaded the gun with it, shot his seven-year-old son Walter, who was getting out of bed as a result of being awakened by the noise of the first shot, again "broke" the gun, ejecting the second exploded shell (there were two freshly-discharged shells found in the room, one on the bed and the other by Walter's body on the floor), took another loaded shell from the box (three shells were missing from the full box after the shooting), put it in the gun, but got the "finger" of the ejector outside or back of the rim of the shell, and in trying to force the gun closed with the shell in this position, "jammed" it so tightly as to prevent either another discharge of the gun or a removal of the shell in the usual manner. He then ran down the stairs and out of the house and along a grassy path, by the side of which he either dropped or placed the gun (it was found there some hours later with the jammed loaded shell still in it), and went to the hotel in Woodridge where the chief marshal of the town was standing talking with a

Mr. Kerr, one of the councilmen, and, first saying, "buy me a package of cigarettes, chief, and I will tell you a story and give you a good job"—told the chief that he, the defendant, had shot his child and his wife. Some hours later the same night the defendant made a statement or confession (after being warned that he was charged with murder, and that anything he might say he must say voluntarily and that it would be used against him) by which statement he admitted the killing, and gave a number of details, among which were his locking his wife out of the bedroom before the shooting, leaving himself and their three children in it, and afterwards opening the door and calling her up the stairs and shooting her as she came up, and in answer to the question of what was his reason, said "I have reasons of my own; I intended to do away with all of us." This statement or confession was made in the presence of a number of witnesses, was taken down in writing and signed by the defendant and by the witnesses who heard it, and this writing was produced at the trial but was not put in evidence, the witnesses who heard the statement testifying from memory to so much of what defendant said in making the statement as related to the murder of Walter.

At the trial the state introduced only evidence of the murder of Walter, and put no evidence as to the practically simultaneous shooting of the wife, and the defendant observed a like reticence upon the same subject. The result was that the only evidence which percolated into the testimony as tending to give even a faint outline of the other half of this terrible picture was the statement by the defendant, when testifying in his own behalf, that he told the chief marshal that he had shot his child and wife, and then the testimony as to the two freshly-discharged shells in the room and the three shells missing from the box of shells.

Under these circumstances the defendant now claims that the court should reverse and set aside the judgment on the ground that the verdict was against the weight of the evidence, in that (1) the state by failing, as defendant alleges it did fail, to prove any motive for the murder of defendant's

son, has failed to establish that the killing was willful, deliberate and premeditated, and (2) the alleged absence of proof of motive taken in conjunction with the very meagre testimony of previous alleged sub-normal mental history, and the usual contradictory testimony of mental and medical experts, *pro* and *con,* should induce the court to conclude that defendant was somewhat of an epileptic, and that at the time of the killing he was suffering from a secret unobservable form of this disease called "petit mal," and not accountable for, because not conscious of, what he was doing.

We do not agree with either of these contentions. As to the first one, proof of motive is not an essential element in a conviction of murder in the first degree. If the proved facts established that the defendant in fact did the killing willfully, that is with intent to kill (which is presumed from the proof of the killing until the contrary appears, *State* v. *Zellers,* 7 *N. J. L.* 220; *Brown* v. *State,* 66 *Id.* 666), and as the result of premeditation and deliberation, thereby implying pre-consideration and determination, there is murder in the first degree, no matter what defendant's motive may have been, nor although he in fact had no motive (using the word in its usual sense of self-serving reason) whatsoever. Suppose, for instance, that this defendant, out of work as he was and unable to supply with the cost of the necessities of life his wife and three children with whom he was not living at the time, had conceived the thought that the burdens, the sufferings and the disappointments of life overbalance its benefits, its happiness and its successes. and that he would be doing a kindness to his little boy by destroying the latter's life and thereby saving him from future suffering and unhappiness, and that having given this idea careful. and thorough consideration, defendant finally arrived at the determination to kill the child, and thereupon, with that intent, he did kill him in the manner proved and admitted in this case, the defendant was just as much guilty of murder in the first degree as if his purpose was (as in fact the jury may have found it to have been) to destroy his wife and children so that their support would not thereafter be a burden upon

him. This is so because the state has a deep interest and concern in the preservation of the life of each of its citizens, and (except in case of self-defense) does not either commit or permit to any individual, no matter how kindly the motive, either the right or the privilege of destroying such a life, except in punishment for crime and in the manner prescribed by law. So strong is this concern of the state, that it does not even permit a man to take his own life, but punishes him for an attempt to do so. Obviously, if he may not lawfully take his own life, even for the best of reasons as they appear to him, there is infinitely more reason why he should not for like reasons be permitted to take the life of another.

Where therefore the fact of a "willful, deliberate and premeditated killing" is established in each of its three essential elements, the question of motive as a feature of the prosecution becomes unimportant. It is where there is an absence or uncertainty of proof upon any one or more of these three elements that the proof or absence of proof by the state of motive becomes important, not because it is an essential element of the crime, but because it is often exceedingly helpful in determining whether or not the crime was in fact committed.

Turning now to defendant's second reason for setting aside this conviction as against the weight of the evidence, it seems, in effect, to be urged that no motive having been proved, as defendant claims, he must be taken to have been unconscious of "the quality and nature of his act, or that it was wrong," when he deliberately shot to death his little child. I say this is in effect urged, because the actual proof of any other facts to justify the assumption is not only most unsatisfactory but is practically *nil*. Apart from the usual, or, at least, very common, children's diseases, including convulsions at teething and one at about seven years and another at between twelve and seventeen years of age, and a dog bite with no bad results during childhood, there seems to have been little else to rely upon except that defendant was a "seven-months' baby," born during a storm at sea, and that

he was rather sickly as a child and of a nervous, retiring dis-
position, not disposed to play much with other children.
Upon this history and the circumstances of the killing in-
cluding defendant's testimony at the trial that he does not
remember anything connected with the shooting of Walter
from the time after he sent his wife out of the room and
locked the door (probably to prepare the gun for use, it
having been freshly oiled when found after the shooting),
and then, subsequently, opened the door and called to her to
come up the stairs (all of which he testified he does remem-
ber) until he saw the blood on Walter's night-clothes after
he had shot him, the mental and medical expert for the de-
fendant, after a two-hour personal physical examination,
testified that he considered the defendant an epileptic, not
of the "grand mal," but of the "petit mal" type; that while
he was physically normal he was mentally subnormal, and
that he had the "mental age" of a child of twelve years.
The expert explained what he meant by "petit mal" as fol-
lows: "There are two forms of epilepsy. There is what
they call the grand mal and the petit mal; that is, either
large or small, in plain language. The petit mal, that is
just a very transient condition. Of course, epilpesy, usually
understood, is—the patient, of course, is subject to convul-
sions, or, as laity calls it, fits. But a man may have epilepsy
and not have fits. It is what we call psychic equivalent; in
other words, instead of having a motor explosion, character-
ized by spasmodic relaxation and contraction of the muscles,
he may have a mental explosion; in other words, it is an
explosion of ideas, and, during this, the characteristics of
epilepsy is a break in the continuity of consciousness and the
absolute loss of memory during this period, and this may
vary from a second to hours." He also explained as to the
mental age of twelve years that that was the average age of
the men of the American army in the world war, thereby
clearly demonstrating, as he frankly admitted (he said "it
was not worth shucks as applied to adults"), what has been
the observation of practically all our judges (*State* v. *Schil-
ling*, 95 *N. J. L.* 145), that the so-called mental age theory

of the experts, at least as applied to adults, is based upon so arbitary and unnatural a scale of ages as a standard as to be utterly misleading to a layman and practically useless, if not worse than useless, in the administration of justice by trial by jury.

The mental and medical experts on behalf of the state, on the other hand, were unanimous in declaring that the defendant was normal mentally as well as physically, and there were besides them several physicians who had had defendant under close observation a great deal of the time which elapsed from the shooting until the trial, and their testimony was to the same effect.

Under these circumstances, apart from defendant's present denial of any recollection of the details of the actual shooting, which denial is at variance with the minute description of these details which he gave to the marshal and to the other witnesses immediately afterward, which was corroborated by what was found in the room where the shooting occurred, there, therefore, is practically nothing but alleged lack of proof of motive upon which this court can, with any logical seriousness, be urged to reverse this verdict as against the weight of the evidence. The species of alleged epilepsy from which defendant's expert thought he was suffering, is the convenient kind which exhibits no outward tell-tale symptoms, such as fits or convulsions which accompany the "grand mal" type, and only involves a temporary secret loss of memory and will-power responsibility for a few seconds or a few minutes. But, says this expert, there must be absolute loss of memory during this time, whether short or long, else there is no epilepsy. This being so, if we are to believe the testimony of the chief marshal and of the numerous witnesses who heard the confession statement and observed its corroborating circumstances, there is an absolute explosion of the epilepsy theory, because the defendant certainly did remember, only three hours after the shooting, all the details which took place while he was claimed to have been in this "petit mal" condition. So we are brought face to face with the naked proposition, must a verdict of murder in the first

degree, where the facts of the murder are clearly proved or admitted, and establish a willful, deliberate and premeditated killing, be reversed by this court on the ground that it is against the weight of the evidence if no proof of motive appears in the case. We think not. If such a murderer were sufficiently sane and conscious at the time he committed the deed to know the quality and nature of his act or that it was wrong, his motive for doing it, as before stated, is immaterial. If he was not so sufficiently sane or conscious, that is a matter of defence, and the burden is upon him to prove it. *Graves* v. *State,* 45 *N. J. L.* 347; *Sherlock* v. *State,* 60 *Id.* 31; *State* v. *Overton,* 85 *Id.* 287; *State* v. *Schilling, supra.*

The absence of a self-serving purpose or motive in any murder case would, of course, be a very material and persuasive circumstance for consideration in connection with other circumstances, such as marked melancholia, as tending to establish the degree of mental irresponsibility which is recognized by our law. But while it may well be that in such cases the attending conditions and circumstances might be such that a jury might consider a clearly established absence of motive sufficient proof of insanity to warrant acquittal, certain it is that where the jury convicts instead of acquits, this court will not reverse on the ground that such a verdict is against the weight of the evidence, because there was no proof of motive.

In the present case the jury did not acquit. On the contrary, they not only convicted, but they made no recommendation for life imprisonment, although it was twice called to their attention that they might do so if they saw fit. Apparently, they either found that the defendant did have a self-serving motive for the crime, or else they found that, although no motive appeared, nevertheless, under the circumstances of the case, they were not convinced that he did not know the quality and nature of his act, or that it was wrong, and, consequently, the defence of insanity having failed, that he should be convicted. We do not feel that

either of these conclusions was against the weight of the evidence.

Turning now to the reasons for reversal claimed to be raised by the exceptions and relied upon by the defendant, we find them all to be without merit.

The gun and the box of shells were both properly admitted in evidence in view of the testimony, and if this were otherwise their admission was obviously quite harmless in view of the testimony of defendant himself in his own behalf.

The ruling of the learned trial judge that the detective Dawson might refresh his recollection while testifying as to statements made in his presence by defendant shortly after the killing, by looking at the written memorandum thereof made by someone else in his presence, and then examined by him and found to be accurate, was not error (*State* v. *Young*, 97 *N. J. L.* 501), but even if it had been, the witness in fact testified entirely from recollection and did not consult the writing.

The contention that the witnesses Dawson and Bratt should not have been permitted to refresh their memories by looking at the writing containing the statement or confession, because at the time the defendant made this statement he had not been apprised of the death of Walter, seems (apart from the question of its legal soundness, as to which we express no opinion) to be open to the objections—first, that that was a disputed point, one of the witnesses having testified that defendant had been so apprised; and second, that the witnesses did not in fact use the writing to refresh their memories.

The contention that there was error in denying defendant's motion to strike out the first or murder count of the indictment at the end of the state's case, because of the alleged failure on the part of the state to prove motive, has already been sufficiently answered.

It is now said that error was committed, in that Dr. Ogden was permitted to testify as to defendant's apparent condition from time to time while in jail awaiting trial after the

shooting, because the effect of this testimony was to estab-
lish defendant's normal mental condition, and the doctor
had not qualified as an alienist. There was no suggestion
at the trial, however, that he was not so qualified, nor was
there any objection on that ground to his being allowed to
testify.

Defendant also objects because the witnesses Kerr and
Ketschke (the chief marshal) testified that defendant stated
to them when he came into the hotel after the shooting that
he had killed his child and his wife. As a matter of fact this
testimony, so far as it related to the killing of the wife, was,
at the request of defendant's counsel and with the express
consent of the prosecutor, stricken from the record by the
learned trial judge. This must have been done, of course,
because both the prosecutor and counsel for the defence
agreed to it. We think the statement, made as it was by
defendant upon his voluntarily surrendering himself to the
chief of police immediately after the killing, and while he
presumably was acting as a result of the stress of the mental
impulses accompanying the commission of the crime rather
than as a result of a subsequent, and therefore probably cal-
culated self-serving conclusion, was admissible as part of the
res gestæ. Hunter v. State, 40 N. J. L. 495; State v. Kane,
77 Id. 244. We also think it was admissible for another
reason. In State v. Deliso, 75 Id. 808, 816, after distin-
guishing between other independent and separate crimes
committed by the defendant, proof of which would only tend
to show a general criminal disposition without having any
direct bearing upon the actual commission or degree of the
crime in question, and which are consequently inadmissible,
and those other crimes which in time or circumstance are so
intimately connected with and a part of the crime in ques-
tion as to show preparation therefor, or presence at the place
of such crime, or a state of mind indicating a purpose for its
commission, Mr. Justice Garrison, speaking for this court,
said as to the latter: "The question there is not the estab-
lishment of the defendant's guilt in respect to such isolated

transaction, but the state of mind therein evinced by him, if it is shown to have been carried forward and exhibited in a criminal act so nearly related in time, place and circumstance that the mental state involved is practically continuous. Assaults by one 'running amuck' [to use the descriptive Orientalism], and multiple offences committed in the act of 'shooting up a town' [to use the recent Americanism], are extreme but apt illustrations.." Can anyone doubt that the act and circumstances of the killing of defendant's wife in this case indicated a state of mind, shown to have been carried forward in the killing immediately afterward of the child Walter, which was so nearly related in time, place and circumstance to that involved in the latter killing, that the mental state involved was practically continuous? We think not, and that, consequently, evidence of the killing of the wife, under the circumstances here involved, would have been admissible if offered. This being so, proof of defendant's admission of such killing was admissible. *State* v. *Deliso, supra; State* v. *Gallagher,* 83 *Id.* 321.

But if all this had been otherwise the testimony was quite harmless, for the defendant subsequently (when he was on the stand in his own behalf) testified to having made the same statement.

The alleged improper question on cross-examination of defendant's mental expert, which elicited the response that if released defendant might commit another similar crime, was not objected to, nor was any motion made to strike out the answer. The criticism of some of the prosecutor's remarks in his argument before the jury appears to fall for the same reason. No adequate effort was made to have the court correct alleged improper statements or to instruct the jury to disregard them.

Neither do we find any error in the charge of the court on the subject of manslaughter.

What the court said in the charge to the jury about the defendant reaching for the gun on the shelf was obviously rather in the nature of an inquiry or suggestion as to some-

thing which the court thought was in the testimony, and the statement to the jury that if they would count the number of shells in the box the court thought they would find there were twenty-two shells, and that those three, the empties and the one which was taken out of the gun, would just make a boxfull, was obviously also merely in the nature of comment upon the evidence. If there were any members of the jury who did not know that a box of shotgun shells contains twenty-five shells, an inspection of the box in evidence, with its twenty-two loaded shells in place and three vacancies, would have supplied so much of that information as was applicable to the present case.

The defendant's last point is that the state failed to prove that the murder was willful, deliberate and premeditated. We have already stated that we think that there was ample proof of the willfulness, the deliberation and the premeditation of this murder.

For the reasons hereinbefore stated the judgment is affirmed.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, BLACK, KATZENBACH, WHITE, WILLIAMS, GARDNER, ACKERSON, VAN BUSKIRK, JJ. 13.

*For reversal*—KALISCH, J. 1.