43 N.J. Super. 1 (1956)
127 A.2d 424
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN ANTHONY SINNOTT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 1956.
Decided December 7, 1956.
*3 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Ira D. Dorian argued the cause for appellant (Mr. Matthew Grayson, attorney).
Mr. Hyman Isaac, Special Assistant Counsel, argued the cause for respondent (Mr. H. Russell Morss, Jr., Union County Prosecutor, attorney).
*4 The opinion of the court was delivered by JAYNE, J.A.D.
The defendant was accused by the indictment of the Union County grand jury of the commission between February 28, 1955 and March 14, 1955 in the City of Elizabeth of the crime of sodomy with a male child under the age of 16 years in violation of N.J.S.A. 2A:143-2. More definitely stated, the alleged offense in the present case was the indulgence by the defendant for sexual gratification in an act of carnal copulation against nature through the anus of a pupil of 13 years of age in the attic of the school of which the defendant was the janitor. Such a deed arouses so much human abhorrence and detestation that the evidence of its commission, the fairness of the defendant's trial, and the propriety of the judgment of conviction demand the most circumspect appellate consideration.
The record before us discloses that the defendant's conviction rested predominantly upon the testimony of the voluntary participant, Edward, and upon that of his companion, Robert, a boy of like age, both of whom were subjected at the trial to rigorous and exhaustive cross-examinations. Their combined narratives of the occurrence do not appear to be an extraordinary imaginative fantasy inspired by any malice toward the defendant. The boys were originally more disposed to retard rather than promote any incriminatory accusation against the defendant. The prosecution was inaugurated by the police authorities, and the supporting testimony of the boys appears to us to have carried the characteristics of truth and sincerity. There was also some competent supplementary evidence of a corroborative tendency. We refrain from rehearsing here the scandalous and demoralizing incidents embodied in the testimony adduced on behalf of the prosecution. In evaluating the truthfulness of the defendant's denials we cannot ignore his acknowledgment that he had been convicted of robbery in 1931 and again in 1934. A conclusion that the defendant's conviction was manifestly inconsistent with *5 the weight of the believable evidence and the product of emotional influences is not justified.
We then proceed to consider whether the defendant experienced a prejudicial deprivation of his substantial rights in the judicial management of his trial. Preliminarily we pause to remark that this is another appeal in which to a conspicuous degree a trial attorney for a defendant listens speculatively to the introduction of adverse testimony without the interposition of any objection, fully cross-examines the witness concerning the subject of the testimony, and then on appeal it is asserted on behalf of the defendant that the admission of the testimony was plainly erroneous. Other than in exceptional circumstances such an ingenious or adventurous practice will not avail the defendant on appeal. State v. Picciotti, 12 N.J. 205, 211 (1953); State v. Rhams, 14 N.J. 282, 290 (1954); R.R. 1:5-1; R.R. 2:5.
An exemplification of just such an endeavor is apparent in the present case in relation to the reception, without disapproval, of the testimony of Robert. But in this instance Robert testified that in response to the defendant's inquiry "You want to go upstairs and have some fun," he accompanied Edward and the defendant with a jar of vaseline to the attic where the defendant first endeavored unsuccessfully to have unnatural relations with him of the same pattern as those immediately thereafter pursued with Edward. This testimony was properly admitted in evidence. State v. Deliso, 75 N.J.L. 808, 816 (E. & A. 1908); State v. Ehlers, 98 N.J.L. 236, 246 (E. & A. 1922); State v. Boccadoro, 105 N.J.L. 352, 356 (E. & A. 1929); State v. McNamara, 116 N.J.L. 497, 499 (E. & A. 1936); State v. Roscus, 16 N.J. 415, 422 (1954). Here, assuredly, the testimony of Robert possessed the requisite elements of time, place, and circumstance in its attachment to the crime with which the defendant was charged, to render it legally admissible.
In the pursuit of their investigations the police searched the attic and basement of the school. In the attic one or more mattresses and the top of a vaseline jar were *6 found. In the defendant's workshop in the basement a quantity of toy whistles for children and some prophylactics were discovered. When interviewed by the police the boys, Robert and Edward, had imparted the information that before their visit to the attic the defendant had given each of them in jelly glasses some wine from a bottle bearing the label "Gold Medal." An empty wine bottle having a like label was detected in a cardboard trash container in the boiler room of the basement.
All of those articles upon presentation by the State were admitted in evidence as exhibits, also without objection. The defendant chose rather to explain that he acquired the whistles to give to children; that the prophylactics were already in the workshop at the inception of his employment, and that he rarely indulges in wine or other alcoholic beverages. At the conclusion of his instruction the trial judge stated in the presence of the jury: "The State does not allege that the prophylactics or the whistles were used in this crime. Therefore, I strike them out and instruct the jury to pay no attention to them. * * * They are not to be taken to the jury room." Counsel for the defendant had by his cross-examination materially demolished the evidential significance of the finding of the empty wine bottle in the trash box available to the use of others than the defendant, and made no application to the court that the bottle too be excluded from the jury's consideration. The admission of the prophylactics, whistles, and wine bottle might have been denied by the court had objection to their reception in evidence been interposed. Reversible error is not discernible in those features of the trial.
Our determination of some of the several subjects specified as reasons for the nullification of the conviction can be adequately communicated in a summary manner. For examples, the boys incidentally explained that it was the threatening precipitation of rain that caused them to discontinue their basketball game and enter the basement quarters of the defendant on the afternoon of the commission of the offense. The defendant obtained a local climatological *7 report from the station of the weather bureau situate at the Newark Airport in Newark to refute their testimony in that respect. It was stipulated by trial counsel that the report be submitted to the jury for consideration. Counsel for the defendant now complains that his right to read the report to the jury during the progress of the trial was arbitrarily denied by the court. It was a discretionary ruling, and counsel for the defendant freely discussed the report in his summation to the jury.
Another suggestion of prejudicial error was the refusal of the court to permit the defendant on his direct examination to declare his existing marital status and the birth of children. Cf. State v. Randle, 128 N.J.L. 496 (Sup. Ct. 1942). The question addressed to the defendant was answered despite the belated objection and ruling of the court, and moreover the defendant's son testified at the trial.
Then there is the insistence that the address of the assistant prosecutor harmfully aroused the sentiments and emotions of the jurors against the defendant. True, in his summation he did make reference biblically to St. Paul, Sodom and Gomorrah and fictionally to the Pied Piper of Hamelin. The author of this opinion vividly recalls the days of his early practice at the bar when the addresses of trial counsel to the jury were generously seasoned with forensic eloquence and impressive oratory. See, inter alia, Snyder, Great Speeches by Great Lawyers (1904). Eloquence of itself is not to be regarded today as offensive so long as the attorney performs within the boundaries of fairness.
It is to be conventionally anticipated that the address of the prosecutor will be disadvantageous to the defendant and that the argument of defendant's counsel will be disserviceable to the contentions of the State. The propriety of such argumentative addresses is not to be measured by the style and quality of their effective persuasiveness but rather in the light of their fairness and logical relation to the evidence. See, State v. Bogen, 13 N.J. 137, 140 (1953); State v. Vaszorich, 13 N.J. 99, 118 (1953); State v. Rios, 17 N.J. 572, 604 (1955).
*8 With those considerations in mind, it is not obvious that the prosecutor's remarks in the existing state of the evidence in the present case were so out of bounds as to necessitate in the interest of justice a reversal of the judgment.
We come now to the consideration of an assigned error of some novelty in our field of appellate experience. Defendant's counsel called to the witness stand one Dr. Herbert Boehm, a licensed practicing physician in this State for 14 years who for a decade had specialized in neurology and psychiatry. The doctor had twice professionally examined the defendant. The first was neuro-psychiatric and the second with the aid of an intravenous injection of the so-called "truth serum" known as sodium pentathol. The doctor's qualifications as a neurologist and psychiatrist do not seem to have been doubted by the court.
There is an indication in the record from which it can be surmised that counsel for the defendant and the State discussed the proposed import of the doctor's testimony and its competency with the trial judge informally. While counsel for the defendant represents in his brief a greater breadth to the proposed testimony than appears recorded in the transcript of the proceedings at the trial, it seems reasonably obvious that the purpose of the interrogation of the doctor was to establish by the doctor's expert opinion based upon the examinations that the defendant exhibited no manifestations of homosexual perversions and was not a sexual deviate. That impression of the object receives confirmation in the remarks of the court in suppressing the introduction of the proposed testimony. The court stated:
"It is not competent in a criminal trial for a psychiatrist to tell the jury whether or not the defendant who is on trial is a sexual pervert or whether he committed the crime or is capable of committing it."
The specialty of psychiatry has developed with the increasing knowledge of mental mechanisms, maladjustments, and the causations of human behavior, normal and abnormal. Perhaps it may be said with some measure of truth that *9 over a period of years the law has lagged watchfully, inquisitively, maybe critically, behind an adaptable recognition of the progress being attained in psychiatry. It is, however, a natural characteristic of the law, resting as it does upon established precedents and attitudes that have received general acceptance, to follow rather than lead in the initial introduction of probationary advances of science.
The law has been precautions, not obstinate, in its adaptation of scientific discoveries to the processes of administering justice. Note as recent examples in our jurisdiction the use of the blood grouping tests, Cortese v. Cortese, 10 N.J. Super. 152 (App. Div. 1950); radar speedmeter, State v. Dantonio, 18 N.J. 570 (1955); the drunkometer, State v. Hunter, 4 N.J. Super. 531, 537 (App. Div. 1949). Assuredly the law does and should within the desirable limits of reasonable precedential stability tend to conform its rules and principles to the growth of standardized experience.
A volume could be written about the historical evolution of expert testimony, its purpose and its usefulness in cases in which it has a pertinent application to a controversial issue and promotes the disclosure of truth. It is not untrue to state that amid the criticisms of expert testimony, somewhat vehement objections have been made in the past by the courts, the bar, and, indeed, by the public to that of a psychiatric variety, particularly in criminal cases. But see, Overholser, "The Psychiatrist and the Law" (1953); Judge Biggs, "The Guilty Mind: Psychiatry and the Law of Homicide" (1955); Strecker's, "Basic Psychiatry" (1952); Overholser and Richmond, "Handbook of Psychiatry" (1947); Glueck, "Mental Disorder and the Criminal Law" (1925); United States ex rel. Smith v. Baldi, 192 F.2d 540 (3 Cir. 1951), affirmed 344 U.S. 561, 73 L.Ed. 391, 97 L.Ed. 549 (1953).
The reasonably expeditious determination of the present appeal neither allows nor requires us to discuss at length the modern propriety or impropriety of permitting qualified psychiatrists to impart to the court and jury a psychological *10 understanding of a defendant on trial in all criminal cases. Such information, when desired, is now normally elicited either before trial or after the defendant's conviction. Vide, N.J.S.A. 2A:164-3; Annotation, 32 A.L.R.2d 434.
However, anent the general subject we may here express our disapproval of the admission of such evidence as being within the boundaries of a conceivably liberalized rule governing the reception of the so-called character evidence. We doubt the wisdom of an expansion for that purpose of our present long established rule. With theoretical consistency, the enlargement of the rule might embrace the introduction of such evidence for the same reason in cases of burglary, robbery, larceny, et cetera.
Nor are we impressed by the advocacy of the admission in evidence of the subjective declarations of the defendant concerning his innocence of the commission of the crime which to some degree may have aided in the formulation of the expert's opinion.
An expert's opinion is of little or no value without the exposure of its basis. Would it be an improved procedure to enable a defendant to abstain from testifying and nevertheless have his defensive explanation revealed as a symptomatic psychological consideration upon which, inter alia, the expert constructed his opinion? Could the State then compose a hypothetical question from the observances and information acquired by the defendant's expert and have its expert express a divergent or oppugnant opinion? Could the State in rebuttal prove that the defendant had bad personality traits? We cannot sanction such a proposed reformation in our adjective law. The trustworthiness and, more so, the efficiency and pragmatical utilization of psychiatry in the determination at trial of the defendant's propensity or lack thereof to commit the stated crime still reside in the stage of study and refinement. It has not been historically disadvantageous for the courts to lag a little.
More specifically we are concerned at the moment with what is commonly denominated a "sex case." The questions are whether in a case of this particular nature the testimony *11 of Dr. Boehm, a qualified psychiatrist, that the defendant was not in his opinion a sexual deviate, should have been admitted in evidence and, if so, was its exclusion palpably and prejudicially erroneous.
Probably because of the paucity of precedential judicial authorities favoring the admission of such testimony, our attention is invited to the present decisional law in the State of California. In People v. Sellers, 103 Cal. App.2d 830, 230 P.2d 398 (1951), in which the defendant was charged with the crime of homosexual perversion, the court rejected expert psychiatric evidence offered by the defendant of the import that the defendant was not a homosexual.
The California Supreme Court in a relatively recent decision in People v. Jones, 42 Cal.2d 219, 266 P.2d 38 (1954), in which the defendant was accused of committing a lewd and lascivious act upon the body of a child under the age of 14 years in violation of the Penal Code, resolved that the defending counsel should have been afforded the right to submit expert psychiatric opinion of the actual personality traits of the defendant on the issue of the unlikelihood that he had committed the crime. This inaugural opinion of the view therein expressed has encountered rather elaborate comment in our legal periodicals. For illustrative examples, see, 102 Univ. of Penn. L.R. 980; 103 Univ. of Penn. L.R. 999; 42 Cal. L.R. 880.
Noticeably the decision in its breadth places such evidence of the defendant's individual dispositions within the orbit of character evidence. With that course of rationalization we have hereinbefore expressed our disapproval. True, the orthodox rule pertaining to character evidence and its equivalent of general reputation has been severely assaulted but not yet defeated. Vide, Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The orthodox rule forbids proof of good character by specific instances of good behavior. There would seem, however, to be more logical reasons for the relevancy and competency in some cases of such expert testimony. Perhaps some day they will be classified.
*12 In the present case there was no representation that the doctor would testify that the defendant was physically or organically incapable of committing the crime, or incapable of having a lustful intent. At most only that it was unlikely and improbable that the defendant did commit the offense because upon but two examinations he did not manifest to the psychiatrist the personality characteristics of a sexual psychopath.
It is also to be noted that one of the examinations was an interview with the aid of narcoanalysis. Cf. People v. Esposito, 287 N.Y. 389, 39 N.E.2d 925, 142 A.L.R. 956 (Ct. App. 1942), and the later decision in People v. Ford, 304 N.Y. 679, 107 N.E.2d 595 (Ct. App. 1952). To make psychiatry practicable in litigation the preferable long range examination of the individual is sought to be substantially diminished by means of the injection of "truth serum." Here, again, the efficacy of the drug objectively in the accomplishment of its intended purpose in other than inquiries of sanity is as yet measurably experimental. See Dession et al., "Drug Induced Revelation and Criminal Investigation," 62 Yale L.J. 315 (1953).
We refrain from announcing our persuasion that in all cases involving the commission of sex crimes such expert testimony should be excluded. Particular cases may occur in which there have been examinations of a greater consecutive duration and a full and complete preliminary disclosure to the court of all of the data upon which the expert opinion is founded, which will in the temporary state of the law enable the trial judge to determine the apparent rationality of the proposed expert opinion. In such instances, depending, of course, on considerations of relevancy to the issue, the admission of evidence of such import might in the light of the science of psychiatry be helpful in some degree to the determination of the defendant's guilt or innocence. In the present case we need not completely open or close the door.
It would appear to be presently judicious to consider the problem in the setting of the individual case until some *13 definite rule evolves from further study and experience. And so, we have here estimated the degree of influence the proffered testimony might have had at the trial had it not been excluded.
In our determination of this appeal, our study of the ruling of the trial court guides us to the conclusion that the rejection of the testimony as proposed was not so manifestly erroneous and prejudicial to the substantial defensive rights of the defendant as to warrant in the interest of justice a reversal of the judgment of conviction.
Affirmed.